UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROY SAFANDA, Trustee in Bankruptcy,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>LINDA K. CASTELLANO, individually, and J.T. DEL ALCAZAR, as Successor Trustee of the Faith F. Campbell Living Trust dated February 18, 1997,<br><br>　　　　Defendants. | No. 14 CV 07094<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Roy Safanda is the trustee appointed to administer the bankruptcy estate of debtor-defendant Linda Castellano. In this adversary proceeding, Safanda seeks the turnover of Castellano's share of her deceased mother's Living Trust, which is being held by defendant J.T. Del Alcazar as successor trustee. The bankruptcy court below agreed with Safanda's argument that Del Alcazar's current possession of the assets is avoidable under 11 U.S.C. § 548(e) and that the funds should be turned over to the bankruptcy estate. Defendants Castellano and Del Alcazar objected to these proposed findings of fact and conclusions of law.

For the following reasons, I find in favor of defendants and against Safanda.

**I.　Legal Standards**

On these claims to avoid a fraudulent transfer under 11 U.S.C. § 548 and for turnover under 11 U.S.C. §§ 543 and 550, brought in-part against a non-party to the bankruptcy (Del Alcazar), a district court reviews the bankruptcy court's proposed

findings of fact and conclusions of law *de novo*. *See Stern v. Marshall*, – U.S. –, 131 S.Ct. 2594, 2620 (2011); *Executive Benefits Insurance Agency v. Arkison*, – U.S. –, 134 S.Ct. 2165, 2173 (2014); *see also In re Bellingham Insurance Agency, Inc.*, 702 F.3d 553, 561-65 (9th Cir. 2012).

Courts dispute the appropriate evidentiary standard to apply to fraudulent-transfer claims. Some say a plaintiff must prove his claim by a preponderance of the evidence. *See, e.g.*, *In re McCook Metals, L.L.C.*, 319 B.R. 570, 587 n.11 (Bankr. N.D. Ill. 2005). Others say he must do so with clear and convincing evidence. *See, e.g.*, *In re Art Unlimited, LLC*, 356 B.R. 700, 707 (Bankr. E.D. Wis. 2006). The Seventh Circuit has not recently weighed in on the matter, but in a fraudulent-transfer decision dating to the 1940s, it stated in dicta that "fraud . . . must be proved by clear and convincing evidence." *Springmann v. Gary State Bank*, 124 F.2d 678, 681 (7th Cir. 1941).

The Supreme Court more recently clarified in *Grogan v. Garner*, that "[b]ecause the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'" 498 U.S. 279, 286 (1991) (holding that a debtor's interest in discharging debts in bankruptcy is not a sufficiently important interest to warrant the heightened standard of proof).[1]

---

[1] By way of example, the high court has found individual interests or rights to be "particularly important"—such that the higher standard applies—in proceedings to terminate parental rights, *Santosky v. Kramer*, 455 U.S. 745 (1982), for involuntary commitment, *Addington v. Texas*, 441 U.S. 418 (1979), and for deportation, *Woodby v. INS*,

2

In light of the presumption mandated by *Grogan*, and because a trustee-as-creditor's interest in avoiding a fraudulent transfer is not materially more important than the interest at stake in *Grogan*, the preponderance-of-the-evidence standard applies in this case.

## II. Facts

*The Faith F. Campbell Living Trust*

On February 18, 1997, Faith F. Campbell created the Faith F. Campbell Living Trust. Campbell appointed herself as initial trustee and gave herself the unrestricted authority during her lifetime "to add or withdraw assets or property of the Trust Estate." [53-1][2] §§ 1.01, 3.01. The Living Trust named Campbell as the "Income Beneficiary" and her four children—including defendant Linda Castellano—as the "Beneficiaries." *Id.* §§ 6.01, 9.01(b)-(c), 13.04(f). In a section called "Spendthrift Provision," the Living Trust further instructed that (*id.* § 10.03):

> [N]o beneficiary of the Trust shall have any right, power, or authority to alienate, encumber, assign, or pledge his or her interest in the principal or income of the Trust in any manner. No interest of any beneficiary shall be subject to any claims of his or her creditors (including the creditors of the spouse of a married beneficiary) or liable to attachment, execution, or other process of law. . . . [I]f by reason of

---

385 U.S. 276 (1966). By contrast, proceedings that might have imposed severe civil sanctions did not implicate such heightened interests. *See, e.g., Steadman v. S.E.C.*, 450 U.S. 91 (1981) (order permanently barring an individual from practicing his profession called for preponderance standard); *S.E.C. v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) (preponderance standard applied to civil case in which conduct to be proved was also criminal).

[2] Citations to docket entries [50] and [53-x] refer to the bankruptcy court's docket in *Safanda v. Castellano, et al.*, 2013-A-01257 (Bankr. N.D. Ill.). All other docket citations refer to this court's docket. Page citations refer to the page numbers displayed in the cited exhibit's CM/ECF header.

bankruptcy or insolvency . . . all or any part of the income or principal might fail to be enjoyed by any beneficiary or might vest in or be enjoyed by some other person, then the interest of that beneficiary shall immediately terminate. Thereafter, the Trustee shall pay to or for the benefit of that beneficiary only those amounts that the Trustee, in its sole and absolute discretion, deems advisable for the education and support of that beneficiary until the death of the beneficiary or the maximum period permissible under the South Carolina rule against perpetuities, whichever first occurs. . . .

Campbell died February 11, 2011, survived by all four of her children. [53-5] at 1-2. The Living Trust originally named Merrill Lynch Trust Company of North Carolina as successor trustee, but that entity—having been absorbed by Bank of America—declined to take the job. *Id.* It therefore fell to the four beneficiaries to appoint a replacement, and together they chose defendant J.T. Del Alcazar—the husband of Castellano's niece. [50] at 62:15-34:8.

*Castellano's Financial Problems*

For 37 years, Castellano and her husband owned and operated a moving business called Peacock Relocation Services. [50] at 46:13-15. Peacock began experiencing financial difficulties in 2008 due to the recession, which eventually led to its closure in the summer of 2011. *Id.* at 46:9-24. By that following fall, Castellano and her husband decided that they needed to file for bankruptcy. *Id.* at 47:14-15.

On October 5, 2011, an attorney representing Castellano sent a letter to an attorney for Del Alcazar, stating ([53-9] at 1):

> I am writing to you in relation to section 10.03 of the trust [i.e., the "Spendthrift Provision"], to advise you that my client Linda Castellano and her husband have experienced insolvency due to the recession. They have closed their business and are filing for bankruptcy protection. Linda Castellano considers that it is the trustee's obligation

4

to exercise his authority consistent with the provisions of the trust identified above.

Upon receiving this letter, Del Alcazar "took it upon [him]self" to move approximately $400,000 (one-quarter of the Trust Estate) from the primary account at Merrill Lynch to a second account at the same institution. [50] at 96:8-12; 100:3-7; 101:13-103:16. Del Alcazar named the second, smaller account the "Faith F. Campbell Spendthrift Trust [for the benefit of] Linda Castellano." *Id.* at 101:21-25; [53-6] at 12. Although Del Alcazar characterized this second account as a "Spendthrift Trust"—which could suggest that it constituted a newly settled trust—the record evidence demonstrates that no new trust was created. Del Alcazar simply moved a portion of the Trust Estate from one account to another, as he was empowered to do by the terms of the Living Trust. *See* [53-1] § 4.02(b).

On November 18, 2011, Castellano and her husband filed voluntary Chapter 7 bankruptcy petitions. *See In re Bruno and Linda K. Castellano*, 11-BK-46854 (Bankr. N.D. Ill.). Three days later, Castellano signed a document entitled "Receipt, Approval of Accounting, Release and Discharge of Trustee." [53-6]. As the name suggests, the document acknowledged that Castellano had received an accounting from Del Alcazar, approved Del Alcazar's proposed distribution of the Trust Estate, and released Del Alcazar from any claims. *Id.* at 1-2. Castellano also agreed that (1) her interest in the Living Trust under § 9.01 was terminated pursuant to § 10.03; (2) she had become a "life-time, limited beneficiary at the sole discretion of the trustee" of the Living Trust; (3) her insolvency required the trustee to retain her interest pursuant to the "Spendthrift Provision"; and (4) she would receive no

5

distribution from the Living Trust, but that the "Spendthrift Trust" (i.e., the second account at Merrill Lynch) would receive her "life-time, limited beneficial interest . . . in full satisfaction of [her] rights and interests under the Living Trust, [but] reserving [her] beneficial interests pursuant to the Spendthrift Trust." *Id*. at 1.

In December 2011, Del Alcazar made distributions from the Trust Estate to Castellano's three siblings. [50] at 43:19-24; 61:24-62:3; 94:1-6. He never made a distribution to Castellano. *Id*.

*Adversary Proceeding*

On October 25, 2013, plaintiff Roy Safanda, the trustee appointed to administer Castellano's bankruptcy estate, instituted an adversary proceeding against Castellano and Del Alcazar. *See Safanda v. Castellano, et al.*, 2013-A-01257 (Bankr. N.D. Ill.). Count I of Safanda's complaint seeks to avoid the transfer of the assets to the "Spendthrift Trust" under 11 U.S.C. § 548(e). Count II seeks turnover of those assets to Castellano's bankruptcy estate.

After a trial, the bankruptcy court entered Proposed Findings of Fact and Conclusions of Law, in which it recommended that judgment be entered in favor of Safanda on both counts. Castellano and Del Alcazar timely objected.

III. Analysis

A. Section 541(c)(2)

When a debtor files for bankruptcy, it automatically creates an estate containing "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 541(c)(2) is an exception

6

to this rule. Property of the debtor that would otherwise be transferable is not transferred to the bankruptcy estate if: (1) it consists of a beneficial interest in a trust, (2) the trust agreement contains language restricting the transfer of the interest, and (3) the transfer restriction is enforceable under "applicable nonbankruptcy law." *See* 11 U.S.C. § 541(c)(2).

The parties cited § 541(c)(2) in their Joint Pretrial Statement and, although not discussed in the bankruptcy court's recommendation, this section should be considered in this case. If a trust-interest is excluded from the bankruptcy estate under § 541(c)(2), the bankruptcy trustee has no basis to avoid its transfer. *See, e.g.*, *In re Hill*, 342 B.R. 183, 206 (Bankr. D.N.J. 2006) ("Even accepting the Trustee's theory that Phyllis transferred a 17% interest in Daniel's pension that should have been hers in equitable distribution, avoiding that transfer would not make any assets available for creditors."); *see also Matter of McClellan*, 99 F.3d 1420, 1423 (7th Cir. 1996) ("Bankruptcy courts do not have subject matter jurisdiction and cannot administer property excluded from or outside the bankruptcy estate."). If § 541(c)(2) applies, then Safanda cannot pursue the transfer and turnover claims.[3]

---

[3] Safanda argues in passing that Castellano "did not claim an exemption of the Spendthrift Trust under South Carolina law or Section 541(c)(2)" in her bankruptcy petition. [5] at 5. That is true. On Schedule C of her petition, Castellano (or her attorney) cited 735 ILCS 5/12-1001(h)(3)—a wholly inapplicable Illinois law pertaining to payments made to a dependent under a life insurance policy. Safanda offers no authority for the rule, however, that such a miscitation precludes Castellano from defending against this adversary proceeding on the basis of § 541(c)(2)—especially when the statute was cited in the Joint Pretrial Statement and argued at trial. Moreover, "[a] voluntary petition, list, schedule, or statement may be amended by the debtor as a matter of course at any time before the case is closed." Fed. R. Bankr. P. 1009(a). The bankruptcy case remains open here, so Castellano may revise the citation at any time. Finally, property interests that fall under § 541(c)(2) arguably need not be listed on Schedule C ("Property Claimed As Exempt"), since such property is excluded from the bankruptcy estate, not exempted from it.

*Castellano's interest was in a trust*

Safanda indirectly argues that the day Castellano filed for bankruptcy, she had no interest in the Living Trust because it had already terminated. Section 8.01 of the Living Trust states that "[u]pon the death of Faith F. Campbell and upon settlement of her estate, this Trust shall terminate." The Living Trust does not define "estate," but Safanda believes it should be taken to mean "probate estate." Since no probate estate was opened here, Safanda believes the conditions of § 8.01 were satisfied the day Campbell passed away. If true, it would mean the trust terminated months before Castellano filed her petition, thereby precluding her from having an interest in the trust at filing. Defendants reject this interpretation. They think the word "estate" is better understood to mean "Trust Estate," which the Living Trust does define. Under this interpretation, the Living Trust still existed when Castellano filed her petition because the Trust Estate had not been settled—among other things, Del Alcazar had yet to make any distributions.

Defendants' interpretation of "estate" is not consistent with other provisions of the trust. Section 4.10 gives the trustee the power "to make loans and advancements from the Trust Estate to the executor or other representative of the Trustor's estate, with or without security." This provision makes plain that "estate" and "Trust Estate" are distinct concepts under the Living Trust. At the same time, though, Safanda's contention that the Living Trust terminated upon Campbell's death also does not make sense in the context of this trust. Such an interpretation would completely frustrate the Living Trust's many other directives and, for that

8

reason, could not have been what Campbell intended. *See Harris Trust & Savings Bank v. Donovan*, 145 Ill.2d 166, 172 (1991) ("The first purpose in construing a trust is to discover the settlor's intent from the trust as a whole, which the court will effectuate if it is not contrary to public policy."); *Epworth Children's Home v. Beasley*, 365 S.C. 157, 166 (2005) (same); *Furmanski v. Furmanski*, 196 Wis.2d 210, 215 (Ct. App. 1995) (same).

Section 9.01 of the Living Trust, like § 8.01, is triggered "[u]pon the death of Faith F. Campbell and upon settlement of her estate." Rather than terminate the trust, however, § 9.01 directs the successor trustee to "divide and distribute as a class gift, free of Trust, the remaining Trust Estate." Thus, as Safanda would have it, the very moment the successor trustee is supposed to begin the process of dividing up the Trust Estate and distributing it to the beneficiaries (forgetting for a moment that a successor trustee must be appointed in the first place), the Living Trust would itself terminate, leaving the erstwhile "Trust Estate" with no legal owner and no legal trustee.

This Catch-22 would apply with equal force, furthermore, to the Living Trust's numerous other provisions that instruct the successor trustee to accomplish certain tasks following Campbell's death but before final distribution of the Trust Estate. *See, e.g.*, [53-1] §§ 4.06 (collect any prior loans made using Trust funds); 4.08 (pay all fees incurred in management of Trust Estate); 4.09 (pay all property taxes incurred by the Trust Estate); 7.01 (pay Campbell's funeral expenses); 7.02(a) (pay

9

any inheritance, estate, or other death taxes); 7.02(c) (seek contribution for federal and state inheritance, succession, transfer or estate taxes).

Campbell did not intend such an outcome. *See Harris Trust*, 145 Ill.2d at 172 ("If possible, the court should construe the will or trust so that no language used by the testator is treated as surplusage or rendered void or insignificant."). While the precise contours of § 8.01 remain unclear, the provision does not cut short, preclude, or otherwise undermine the successor trustee's ability to accomplish the Living Trust's post-death instructions, including the instruction to equally distribute the Trust Estate to the beneficiaries.

On the day Castellano filed for bankruptcy, Del Alcazar had not yet made any distributions. Consistent with the reading that best reflects Campbell's overall intent, the Living Trust was still in effect and Castellano had a beneficial interest in it.

*The Living Trust sought to restrict transfers of its beneficiaries' interests*

There is no doubt the Living Trust sought to restrict the transfer of its beneficiaries' interests. That requirement of § 541(c)(2) is therefore satisfied. Nevertheless, it is worth noting a distinction that has for the most part been ignored: Although all of § 10.03 is entitled "Spendthrift Provision," the section actually contains two distinct provisions that independently restrict transfers of the beneficiaries' interests, and only one of which is a spendthrift provision.

The first part of § 10.03 is the traditional spendthrift clause. It precludes all voluntary and involuntary transfers of interests. It prevents beneficiaries from

alienating their interests in the Living Trust, and it prevents creditors from getting their hands on the same. The second part of § 10.03, by contrast, purports to convert a beneficiary's unrestricted interest in the Living Trust into a discretionary one. Such a conversion is not the work of a traditional spendthrift provision; instead, it is more appropriately thought of as establishing a conditional discretionary trust. *Compare* Uniform Trust Code § 502 ("Spendthrift Provision") *with* § 504 ("Discretionary Trusts").

So, on the question of whether the Living Trust sought to restrict the transfer of its beneficiaries' interests, the precise answer is: Yes, twice.

*The Living Trust's transfer restrictions were enforceable under applicable state law*

Property is excluded under § 541(c)(2) only if the relevant transfer restriction is valid under "applicable nonbankruptcy law"—here, state law. The parties in this case debate which state's laws apply. South Carolina, Illinois, and Wisconsin are all offered up as possibilities, but the outcome is the same no matter which you choose: The day Castellano filed for bankruptcy, transfer of her interest in the Living Trust was validly restricted by the spendthrift and discretionary trust provisions.

<u>Spendthrift provisions were valid under South Carolina, Illinois, and Wisconsin law</u>

In South Carolina, Illinois, and Wisconsin, a spendthrift provision will validly protect against an involuntary transfer of interests (genuinely held in trust) if (1) the trust is not self-settled and (2) the spendthrift provision restricts both voluntary and involuntary transfers. S.C.C.L. § 62-7-502(a); *In re Marriage of Chapman*, 297

Ill. App. 3d 611, 618-20 (1st Dist. 1998); *In re Marriage of Sharp*, 369 Ill. App. 3d 271, 281 (2d Dist. 2006); Wisc. Stat. § 701.06(1) (2011).

Safanda, relying on *In re Lunkes*, 427 B.R. 425 (N.D. Ill. 2010), first contends that the Living Trust's spendthrift provision was not valid as to Castellano because it was never valid as to Campbell. *Lunkes* and Safanda frame the issue as whether "a trust that is not—and cannot be—a spendthrift trust at the moment of creation can convert itself into a spendthrift trust at a later date." *Lunkes*, 427 B.R. at 430. But the issue is not whether the Living Trust was or was not a "spendthrift trust." The question is whether a specific provision was valid as to a specific person's interest at a specific point in time. Along these same lines, no case cited in *Lunkes* or presented by Safanda holds that a spendthrift provision in a revocable living trust is *per se* invalid as to remainder beneficiaries. Such an overbroad rule would be inconsistent with the universal acceptance of non-self-settled spendthrift provisions. It would also do nothing to address the conduct the self-settled-trust rule is meant to undermine: debtors "t[ying] up property in such a way that [they] can enjoy it but prevent creditors from reaching it." *Cameron v. Ewing*, 424 N.J. Super. 396, 408 (App. Div. 2012). Finally, although cases in Illinois (the source of law in *Lunkes*) do not squarely address the issue, the state's limited treatment of this scenario takes for granted that Safanda's premise is not the correct one. *See Marriage of Stevens*, 292 Ill. App. 3d 994 (4th Dist. 1997) (recognizing that originally invalid spendthrift provision was valid as to a remainder beneficiary, but applying statutory child-support exception).

Safanda next argues that the spendthrift provision stopped protecting Castellano's interest in the Living Trust once Del Alcazar was legally permitted to make distributions of the Trust Estate. This argument fails because, under the laws of the three relevant states, spendthrift provisions continue to restrict transfers of interests at least until a distribution is mandated or declared by the trustee—neither of which happened here.

The rules on spendthrift provisions are most clear in South Carolina, which adopted the Uniform Trust Code in 2006. There, a valid spendthrift provision continues to block an involuntary transfer of a trust interest until the beneficiary actually receives the distribution. *See* S.C.C.L. § 62-7-502(c) ("A beneficiary may not transfer an interest in a trust in violation of a valid spendthrift provision and, except as otherwise provided in this article, a creditor or assignee of the beneficiary may not reach the interest or a distribution by the trustee before its receipt by the beneficiary."). South Carolina law does allow a creditor to reach unreasonably delayed mandatory distributions, S.C.C.L. § 62-7-506, but there is no evidence of that occurring here.

No Illinois statute specifically addresses spendthrift provisions. Instead, the state's rules are based partly on the common law, *see Rush University Medical Center v. Sessions*, 2012 IL 112906 ¶ 20, and partly on its Code of Civil Procedure, *see* 735 ILCS 5/2-1403. Section 2-1403, which is entitled "Judgment debtor as beneficiary of trust," states that "No court . . . shall order the satisfaction of a judgment out of any property held in trust for the judgment debtor if such trust has,

13

in good faith, been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor. . . .").

Given this relatively limited authority on spendthrift provisions, the scope of spendthrift protection in Illinois is far from clear. State decisional law suggests, however, that a creditor may reach spendthrift-protected interests only after the interest has been distributed by the trustee. *See In re Marriage of Sharp*, 369 Ill. App. 3d 271, 281 (2d Dist. 2006); *Community Bank of Elmhurst v. Klein*, 2014 IL App (2d) 121074, ¶¶ 11-16. In *Sharp*, the court held that spendthrift protections end once the beneficiary has "access to the trust assets." *Sharp*, 369 Ill. App. 3d at 281. The defendant in that case had access to the trust assets, the court held, once trust income was paid to him, "[f]or where a trust beneficiary receives a distribution, this unfettered right of control negates any future effect of the spendthrift clause." *Id*. Likewise, in *Klein*, the court distinguished between funds that were still "in the hands of the trustee" and funds that had been "distributed from the trust," with only the latter being reachable by creditors. 2014 IL App (2d) 121074 at ¶ 16.

In this case, Castellano neither received any distributions from Del Alcazar, nor otherwise had access to the Trust Estate. Although she was a beneficiary and almost certainly would have had access at some point (i.e., an "unfettered right of control"), Del Alcazar's duty to divide the Trust Estate (which involved liquidating real property), combined with his discretion to "retain any property placed in Trust by Trustor for as long as [he] deem[ed] advisable," precluded Castellano from ever having access to the trust funds at any point before she filed for bankruptcy. *See*

14

[53-1] §§ 4.01, 9.01. Nor did Del Alcazar's act of segregating a quarter of the Trust Estate into a second account at Merrill Lynch constitute a distribution to Castellano. The funds remained the property of the Living Trust and subject to Del Alcazar's discretion. His act of moving these funds gave Castellano no greater access to them.[4]

As for Wisconsin, in 2011 the state's law on the involuntary transfer of interests in trust principal was as follows:

> The interest in principal . . . cannot be assigned and is exempt from claims against the beneficiary, but a judgment creditor, after any payments of principal have become due or payable to the beneficiary pursuant to the terms of the trust, may apply to the court for an order directing the trustee to satisfy the judgment out of any such payments and the court in its discretion may issue an order for payment of part or all of the judgment.

Wisc. Stat. § 701.06(2) (2011).

No Wisconsin case has interpreted the phrase "due or payable" as used in this subsection. In *In re McCoy*, however, a federal bankruptcy court sitting in Wisconsin held that "the phrase 'due or payable' was intended to mean mandatory payments under the terms of the trust," i.e., "those that a beneficiary is entitled to receive, or payments that have been declared by a trustee with discretion to do so." 464 B.R. 832, 839 (Bankr. W.D. Wis. 2011). The court arrived at this construction by comparing § 701.06(2) to a nearby provision on self-settled trusts, under which judgment creditors could reach "payments of income or principal as they are due,

---

[4] Del Alcazar's status as a relative-by-marriage does not mean Castellano had an unfettered right to control the trust funds. The record contains no evidence that Del Alcazar was willing to ignore the Living Trust's standard for the use of his discretion, in favor of doing whatever Castellano demanded.

15

presently or in the future, or which are payable in the trustee's discretion . . . ." Wisc. Stat. § 701.06(6)(a) (2011). According to the court, this slight contrast in language, coupled with the larger statute's "apparent purpose . . . to include different treatments for interest payments, distributions of principal, and protection of self-settled trusts," "suggests that the legislature intended relatively more spendthrift protection for principal distributions" than for self-settled trusts. *McCoy*, 464 B.R. at 839.

This makes sense. Section 701.06(2)'s reference to "payments of principal [that] have become due or payable to the beneficiary" therefore means principal that the trustee declares will be distributed, or principal the trustee must distribute immediately. In this case, the Trust Estate distributions were subject to Del Alcazar's timing discretion, *see* [53-1] §§ 4.01, 9.01, so they were not "mandatory."[5] Likewise, Del Alcazar never declared any distributions to Castellano. The day Castellano filed for bankruptcy, her interest in the Living Trust remained protected under Wisconsin law as well.

### Discretionary trusts were valid under South Carolina, Illinois, and Wisconsin law

In all three states, discretionary trusts, like spendthrift provisions, validly restrict the transfer of a beneficiary's interest. This rule is most clear in South Carolina where, having adopted the Uniform Trust Code, state statute makes explicit that discretionary trusts are valid and cannot ordinarily be reached by a beneficiary's creditors. S.C.C.L. § 62-7-504(b).

---

[5] Nor is there any evidence that Del Alcazar unreasonably delayed distributions or otherwise acted in bad faith in that regard.

The issue is less straightforward in Illinois and Wisconsin. The Illinois Compiled Statutes do not specifically address the validity or effect of discretionary trusts. But the laws do allow child-support creditors to reach such assets, which itself suggests that other creditors ordinarily cannot. 735 ILCS 5/2-1403(1)-(2); *Stevens*, 292 Ill.App.3d 994, 1001 (4th Dist. 1997). That inference is also supported by the fact that the language of 735 ILCS 5/2-1403 fits discretionary trusts just as well as it fits spendthrift provisions; the only test being whether the trust in question was created in good faith by "a person other than the judgment debtor." Finally, although no Illinois case substantively explores the protections provided by discretionary trusts, several decisions state or imply that such trusts generally are protected against the reach of creditors. *See, e.g.*, *Button v. Elmhurst National Bank*, 169 Ill. App. 3d 28, 40 (2d Dist. 1988) ("'Admittedly, the beneficiary of a discretionary trust for care, comfort, maintenance or well-being is endowed with no property which an ordinary creditor may reach.'") (quoting *Bureau of Support v. Kreitzer*, 16 Ohio St.2d 147, 150 (1968)); *Estate of McInerny*, 289 Ill. App. 3d 589, 598 (1st Dist. 1997) (holding that a creditor could not reach funds held in a "discretionary supplemental support trust with a spendthrift provision."); *Goodpasteur v. Fried*, 183 Ill. App. 3d 491, 496 (1st Dist. 1989) (McNamara, J., dissenting) ("The trust also directs that the trustees distribute funds only as they shall determine in their sole discretion. This is known as a discretionary trust. . . . [I]n such a discretionary trust, the beneficiary holds no vested interest until the trustees decide to make a payment to the beneficiary.").

Like Illinois, Wisconsin did not have a statute affirmatively addressing discretionary trusts in 2011. But it too allowed access to discretionary-trust funds under certain circumstances, *see* Wisc. Stat. § 701.06(4)(b) (2011) (for child support); § 701.06(5)(b) (2011) (to repay public support of beneficiary), which again suggests a general rule of no access. This inference, furthermore, is supported by Wisconsin case law. *See Grohmann v. Grohmann*, 180 Wis.2d 690, 694-95 (Wis. App. 1993) (affirming trial court's determination that it had no authority to order payment of child support by discretionary trust prior to trustee deciding to authorize a distribution).

Because on the day Castellano filed for bankruptcy the laws of South Carolina, Illinois, and Wisconsin all acknowledged the ability of discretionary trusts to restrict the transfer of a beneficiary's interest, § 10.03's discretionary trust language also constituted a valid restriction on the transfer of Castellano's interest under applicable nonbankruptcy law.

Regardless of whether the Living Trust's conditional discretionary-trust language was triggered, Castellano had a beneficial interest in a trust subject to a valid nonbankruptcy restriction on transfer. Therefore, her interest in the Living Trust fell within the scope of § 541(c)(2) and is excluded from her bankruptcy estate.

**B.  Section 548(e)**

The record does not support application of § 548(e) in this case. "In addition to any transfer that the trustee may otherwise avoid, the trustee may avoid any transfer of an interest of the debtor in property that was made on or within 10 years

18

before the date of the filing of the petition, if—(A) such transfer was made to a self-settled trust or similar device; (B) such transfer was by the debtor; (C) the debtor is a beneficiary of such trust or similar device; and (D) the debtor made such transfer with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made, indebted." 11 U.S.C. § 548(e). At all times, Castellano's potential share remained the property of the Living Trust in the custody of Merrill Lynch. Although Safanda segregated a portion of the Living Trust into a second account at Merrill Lynch earmarked for potential discretionary distributions to Castellano, that act did not end the Living Trust's ownership of those funds, constitute a distribution to Castellano, or create a new trust. It was simply a division of trust property as permitted by § 4.02(b) of the Living Trust. Accordingly, because there was no transfer of an interest of the debtor, § 548(e) does not apply.

## IV. Conclusion

Castellano and Del Alcazar's objections to the bankruptcy court's proposed findings of facts and conclusions of law are sustained. Enter judgment for defendants, and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: 4/27/15